## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------------------X
THOMAS BABILON, as Father and Natural Guardian of G.B., a/k/a
BABY S.S., an infant under the age of fourteen (14) years,

Plaintiffs,

-against-

UNITED STATES OF AMERICA,

Defendants.

------------------------------------------------------------------------------------X

**CIVIL ACTION NO.:**

  5:17-cv-1307(TJM/TWD)

**COMPLAINT**

ECF Action

THOMAS BABILON, as Father and Natural Guardian of G.B. a/k/a BABY S.S., an infant under the age of fourteen (14) years, by their attorneys, THE JACOB D. FUCHSBERG LAW FIRM, LLP, as and for their Complaint, allege the following, upon information and belief:

### INTRODUCTION

1.      This is an action against the defendant United States of America under the Federal Tort Claims Act, (28 U.S.C. § 2671, *et seq.*) and 28 U.S.C. § 1346(b)(1), for negligence and professional malpractice in connection with the medical care provided to Shilo Saunders, who was pregnant with and giving birth to infant plaintiff G.B., by Kenroy Scott, M.D. ("Dr. Scott"), a Public Health Service Employee who was employed by the Syracuse Community Health Center ("SCHC"), a Federally Declared Health Care Center under the Federally Supported Health Centers Assistant Act, and by the UNITED STATES OF AMERICA ("United States"), who was responsible and vicariously liable for the acts and omissions of Scott and SCHC (together the "Defendants").

2.      The claims herein are brought against the Defendants pursuant to the Federal Tort Claims Act (28 U.S.C. §2671, *et seq.*) and 28 U.S.C. §1346(b)(1), for money damages as

1

compensation for personal injuries and damages caused by the Defendants' negligence, professional malpractice, and/or departures from accepted standards of medical care and treatment.

3.    Plaintiffs THOMAS BABILON, as Father and Natural Guardian of G.B., A/K/A BABY S.S., an infant under the age of fourteen (14) years (hereinafter the "Plaintiffs"), initially commenced a lawsuit against Kenroy Scott, M.D., among other defendants, on behalf of infant plaintiff G.B., in the Supreme Court of the State of New York, County of Onondaga, under Index Number 2015EF3918, on September 22, 2015 (hereinafter the "State Court Action").

4.    On May 2, 2016, a Notice of Removal was filed and served by the United States, removing the State Court Action from State Court to Federal Court in the United States District Court for the Northern District of New York, under Civil Action No.: 5:16-cv-0497 (the "Original Federal Action").

5.    On November 21, 2016, the Honorable Senior U.S. District Judge Thomas J. McAvoy issued an Order, which substituted the United States as the defendant for Kenroy Scott, M.D. in the Original Federal Action as the Court found that the United States presented sufficient proof that SCHC and Dr. Scott were deemed eligible under the Federal Torts Claim Act, and that Dr. Scott was acting within the scope of his employment as a health-care provider with SCHC to be deemed a Federal Public Health Service Employee. See Court Order, attached as Exhibit 3. The Court also found that as the Plaintiffs had not filed an Administrative Claim with the United States prior to filing the State Court Action the case would be dismissed for lack of subject matter jurisdiction, and then remanded the cases and causes of action against the remaining defendants back to State Court. See id.

6.    The Plaintiffs have fully complied with the provision of 28 U.S.C. § 2675 and 28 U.S.C. §2679, of the Federal Tort Claims Act, with the service of an Administrative Claim on

November 29, 2016, which was received on November 30, 2016. See Standard Form 95 served by the Plaintiffs, attached hereto as Exhibit 1; see letter acknowledging receipt of Standard Form 95, attached as Exhibit 2.

7.     Plaintiffs' Administrative Claim was timely presented, served, and/or filed by the Plaintiffs on the United States and Plaintiffs timely commenced the action herein in accordance with 28 U.S.C. §2401(b) and 28 U.S.C. §2679(5).

8.     Pursuant to 28 U.S.C. §2679, as Plaintiffs' action against the United States (who was substituted as a defendant for Dr. Scott) was "dismissed for failure to first present a claim pursuant to section 2675(a)," and as an Administrative Claim was served and presented to the appropriate federal agency within 60 days after dismissal of the civil action as Plaintiffs served and presented their Administrative Claim on November 30, 2016, 9 days after the dismissal of the claim, Plaintiff's "claim shall be deemed to be timely presented under section 2401(b) . . . if (A) the claim would have been timely had it been filed on the date the underlying civil action was commenced," which was on September 22, 2015, the date the Plaintiffs commenced the State Court Action against Dr. Scott and the other defendants.

9.     Plaintiffs' Administrative Claim would have been timely had it been filed, served, and/or presented on September 22, 2015, as Plaintiffs' claim against the United States did not begin to accrue until a time period after the date of September 22, 2013, as neither the Plaintiffs and/or Shilo Saunders knew that there was a government and/or an iatrogenic cause for G.B.'s injuries and conditions, nor would a reasonable prudent person have known there was a government and/or iatrogenic cause for G.B.'s injuries and conditions reacting to similar circumstances prior to some time period after the date of September 22, 2013.

10.     As Plaintiffs claim did not accrue until a time period after September 22, 2013, this means that had Plaintiffs served, filed, and/or presented an Administrative Claim by September 22, 2015, such Administrative Claim would have been timely served, filed, and/or presented within two years of the accrual of Plaintiffs' claims against the United States, and thus, as Plaintiffs served, filed, and/or presented an Administrative Claim within 60 days after dismissal of the relevant civil action (the Original Federal Action), Plaintiffs' Administrative Claim was timely presented, filed, and/or served under 28 U.S.C. §2401(b), pursuant to 28 U.S.C. §2679(5).

11.     Neither plaintiff Thomas Babilon, nor Shilo Saunders (mother of infant plaintiff G.B.), ever sought care, treatment, and/or services from SCHC and/or Dr. Scott at any time prior to the birth and delivery of S.B., and never sought any obstetrical care and treatment from either SCHC and/or Dr. Scott.

12.     Shilo Saunders received her pre-natal care and treatment at Upstate University Hospital, also known as the Perinatal Center and/or University OB/GYN Associates, Inc., which provided physicians including Robert Silverman, M.D., and Richard Aubry, M.D., who have been named as defendants in Plaintiffs' State Court Action.

13.     Neither Upstate University Hospital, the Perinatal Center, University OB/GYN Associates, Robert Silverman, M.D., Richard Aubry, nor any of the other physicians who rendered pre-natal care to Shilo Saunders were employees of the United States and/or SCHC.

14.     Shilo Saunders was admitted to Crouse Hospital, which is a private hospital not owned by the United States and is not a federal health center, on September 30, 2005, for delivery induction, and was admitted to the hospital by Richard H. Aubry, M.D., and remained admitted to Crouse Hospital through the birth of her daughter, infant plaintiff S.B., which occurred on October 1, 2005.

4

15.     At no time prior to or during Shilo Saunders's and/or G.B.'s admission to Crouse Hospital did Shilo Saunders and/or Thomas Babilon ever meet or see Dr. Scott, including at the time of G.B.'s birth and delivery, despite the fact that Dr. Scott's name is listed in the medical records of Shilo Saunders as being an attending physician who was allegedly present at the delivery of G.B.

16.     Dr. Scott never came to Shilo Saunders's bedside at Crouse Hospital at any time on September 30, 2005, and/or October 1, 2005.

17.     Dr. Scott was not present at Shilo Saunders's bedside or in Shilo Saunders's delivery room during the birth and delivery of G.B.

18.     Until at least some time period following September 22, 2013, neither Thomas Babilon nor Shilo Saunders had ever heard of or learned the name of Kenroy Scott, nor did they know, until at least April 2014, that Dr. Scott was listed in Shilo Saunders's medical records from Crouse Hospital as being an attending physician who was present at the birth and delivery of G.B.

19.     Until at least some time period following September 22, 2013, neither Thomas Babilon nor Shilo Saunders were aware of any relationship between Dr. Scott and either Crouse Hospital, Upstate University Hospital, the Perinatal Center, University OB/GYN Associates, Robert Silverman, M.D., and/or Richard Aubry.

20.     Until at least some time period following September 22, 2013, neither Thomas Babilon nor Shilo Saunders were aware of any relationship between SCHC and either Crouse Hospital, Upstate University Hospital, the Perinatal Center, University OB/GYN Associates, Robert Silverman, M.D., and/or Richard Aubry.

21.     Until at least some time period following September 22, 2013, neither Thomas Babilon nor Shilo Saunders were aware of any involvement in the birth and delivery of infant

plaintiff S.B. at Crouse Hospital by an employee of SCHC, the United States, a Federally Funded

Clinic, and/or a Federally Declared Health Center

22.     Upon information and belief, SCHC does not contain any patient records for Shilo

Saunders, or any records related to the birth and delivery of G.B.

23.     Neither Thomas Babilon nor Shilo Saunders learned of any possible iatrogenic

and/or governmental cause for G.B.'s injuries until at least within two years of September 22, 2015

(some time period after September 22, 2013), nor would a reasonably prudent person have learned

of such until after such time period.

24.     To date, the Plaintiffs have not received any Notice of Final Denial of their

Administrative Claim.

25.     A Notice of Final Denial was not served on or received by the Plaintiffs.

26.     The Plaintiffs are now timely filing this Complaint, pursuant to 28 U.S.C. § 2401(b)

and 28 U.S.C. §2675, as no Notice of Final Denial has been received by the Plaintiffs, and as more

than six months have passed after the Plaintiffs initially served the Standard Form 95 on the United

States.

## PARTIES, JURISDICTION AND VENUE

27.     Plaintiffs Thomas Babilon and G.B. were at all pertinent times, residents of the

State of New York, County of Onondaga.

28.     At all pertinent times, Defendant United States, through its agency, the United

States Department of Health and Human Services, operates The Syracuse Community Health

Center, with addresses including at 819 South Salina Street, Syracuse, New York 13202, and other

locations.

29.     Defendant United States, including its directors, officers, operators, administrators, employees, agents, servants, and staff at the Syracuse Community Health Center, including Dr. Scott, are sometimes collectively referred to as "SCHC."

30.     The Defendants herein have done business in New York and/or have conducted and/or transacted business in New York, have committed one or more tortious acts within New York, and/or have otherwise performed acts within New York giving rise to injuries and losses within New York, which acts subject the Defendants to the jurisdiction of this Court.

31.     Upon information and belief, SCHC was and still is a New York Corporation. Defendant SCHC does business and/or transacts business in the State of New York and/or should have expected its acts to have consequences within the State of New York.

32.     At all pertinent times, defendant United States owned, operated, controlled, was responsible for, and/or managed a medical clinic and/or health care center pursuant to the laws of the State of New York for the care of the sick, also known as the Syracuse Community Health Center, with addresses including at 819 South Salina Street, Syracuse, New York 13202, and/or other locations, which provided personnel, including doctors, nurses, attendings, physicians' assistants, and others for the care and treatment of its patients and which held itself out to the public as furnishing treatment facilities where patient could be treated for various ailments.

33.     At all pertinent times, defendant Dr. Scott was and still is a resident of the State of New York.

34.     At all pertinent times, defendant Dr. Scott was a physician duly licensed to practice medicine in the State of New York.

35.     At all pertinent times, defendant Dr. Scott held himself out to the general public, as a physician offering professional services and medical, gynecological, and/or obstetrical care, treatment, and/or services.

36.     From September 30, 2005, through October 1, 2005, defendant Dr. Scott was an employee of defendant United States.

37.     From September 30, 2005, through October 1, 2005, defendant Dr. Scott was an employee of defendant SCHC.

38.     From September 30, 2005, through October 1, 2005, defendant Dr. Scott was a servant of defendant United States.

39.     From September 30, 2005, through October 1, 2005, defendant Dr. Scott was a servant of defendant SCHC.

40.     From September 30, 2005, through October 1, 2005, defendant Dr. Scott was an agent of defendant United States.

41.     From September 30, 2005, through October 1, 2005, defendant Dr. Scott was an agent of defendant SCHC.

42.     From September 30, 2005, through October 1, 2005, defendant Dr. Scott was an independent contractor under the supervision, direction, and/or control of defendants United States.

43.     From September 30, 2005, through October 1, 2005, defendant Dr. Scott was an independent contractor under the supervision, direction, and/or control of defendant SCHC.

44.     From September 30, 2005, through October 1, 2005, defendant Dr. Scott rendered medical services, care, and/or treatment at SCHC.

45.     At all pertinent times, defendant Dr. Scott rendered medical services, care, and/or treatment at Crouse Hospital, located at 736 Irving Avenue, Syracuse, NY 13210.

46.     At all pertinent times, defendant Dr. Scott maintained offices for the practice of medicine at locations, which include, but are not limited to, 819 South Salina Street, Syracuse, New York 13202.

47.     From on or about September 30, 2005, through on or about October 1, 2005, defendant Dr. Scott rendered medical services, care, and/or treatment to and/or was responding for rendering, directing, supervising, and/or ordering medical services, care, and/or treatment for Shilo Saunders and/or infant plaintiff G.B. at Crouse Hospital, located at 736 Irving Avenue, Syracuse, NY 13210.

48.     At no time prior to September 30, 2005, did Dr. Scott render medical services, care, and/or treatment to Shilo Saunders and/or infant plaintiff G.B.

49.     At all pertinent times, defendant SCHC is a health center program grantee under 42 U.S.C. §254b, and a Federally Declared Health Care Center under the Federally Supported Health Centers Assistant Act.

50.     From September 30, 2005, through October 1, 2005, defendant Dr. Scott was a Public Health Service Employee under 42 U.S.C. §233.

51.     At all pertinent times, SCHC held themselves out to the public, as providers of high quality health services, with the expertise necessary to maintain the health and safety of obstetrical patients.

52.     At all pertinent times, the directors, officers, operators, administrators, health care providers, employees, agents, servants, contractors, and/or staff of defendant SCHC, including defendant Dr. Scott, were employed by and/or acting on behalf of defendant United States.

53.     At all pertinent times, SCHC and Dr. Scott stood in such a relationship with each other in the care, treatment, and/or services rendered to plaintiff G.B., so as to make SCHC liable for the acts and omissions of defendant Dr. Scott.

54.     At all pertinent times, Dr. Scott and defendant United States stood in such a relationship with each other in the care, treatment, and/or services rendered to plaintiff G.B., so as to make defendant United States liable for the acts and omissions of defendant Dr. Scott.

55.     At all pertinent times, SCHC and defendant United States stood in such a relationship with each other in the care, treatment, and/or services rendered to plaintiff G.B., so as to make defendant United States liable for the acts and omissions of SCHC.

56.     At all pertinent times, defendant United States was and is responsible for the negligent acts and/or omissions of their employees, agents, health care centers, and/or servants, under Respondeat Superior, including the negligent acts and/or omissions of SCHC and Dr. Scott.

57.     At all pertinent times, defendant United States was and is responsible for the negligent acts and/or omissions of SCHC and Dr. Scott.

58.     This Court has jurisdiction pursuant 28 U.S.C. § 1346(b)(1).

59.     Venue is proper in this Court pursuant to 28 U.S.C. § 1402(b) in that all, or a substantial part, of the acts and omissions forming the basis of these claims occurred in the Northern District of New York.

## AS AND FOR A FIRST CAUSE OF ACTION

60.     Plaintiffs reallege and reincorporate each and every allegation above as if fully set forth herein.

61.     From on or about September 30, 2005, through on or about October 1, 2005, Shilo Saunders, who was pregnant with infant plaintiff S.B., presented to Crouse Hospital for professional

10

care and treatment, for testing, examinations, monitoring, medical care and treatment, and/or certain medical complaints, symptoms, signs, conditions, and medical history, including, but not limited to, induction, pregnancy, labor, labor pains, contractions, labor difficulties, fetal distress, diabetes, the need for the infant plaintiff to be delivered and/or c-sectioned, and/or other signs, symptoms, and/or conditions, as well as for testing, examinations, monitoring, and/or obstetrical and/or medical care, treatment, and/or services.

62.     From on or about September 30, 2005, through on or about October 1, 2005, Dr. Scott rendered and/or was responsible for rendering continuous medical, diagnostic, consulting, gynecological, obstetrical, maternal fetal medicine, surgical, and/or other medical care, treatment, and services to Shilo Saunders and/or infant plaintiff G.B.

63.     From on or about September 30, 2005, through on or about October 1, 2005, SCHC, and/or through its employees, agents, and/or servants, rendered and/or was responsible for rendering continuous medical, diagnostic consulting, gynecological, obstetrical, maternal fetal medicine, surgical, and/or other medical care, treatment, and/or services to Shilo Saunders and/or infant plaintiff G.B.

64.     From on or about September 30, 2005, through on or about October 1, 2005, defendant United States, and/or through its employees, agents, and/or servants, rendered and/or was responsible for rendering continuous medical, diagnostic consulting, gynecological, obstetrical, maternal fetal medicine, surgical, and/or other medical care, treatment, and/or services to Shilo Saunders and/or infant plaintiff G.B.

65.     At all pertinent times, defendant Dr. Scott undertook and/or had a duty to attend, care for, and treat Shilo Saunders and/or infant plaintiff G.B. in a reasonable, proper, and skillful manner.

66.     At all pertinent times, defendant SCHC undertook and/or had a duty to attend, care

11

for, and treat Shilo Saunders and/or infant plaintiff G.B.in a reasonable, proper, and skillful manner.

67.    At all pertinent times, defendant United States undertook and/or had a duty to attend, care for, and treat Shilo Saunders and/or infant plaintiff G.B.in a reasonable, proper, and skillful manner.

68.    That the aforesaid medical, diagnostic, consulting, gynecological, obstetrical, maternal fetal medicine, surgical, and/or other medical care, treatment, and services provided by the Defendants were rendered carelessly, recklessly, unskillfully, negligently, and not in accordance with accepted standards of medical care and treatment in the community.

69.    From on or about September 30, 2005, through on or about October 1, 2005, Dr. Scott, and/or through his employees, servants, agents, and/or contractors, and/or through those he supervised, issued orders to, and/or directed, and/or through those he was supposed to supervise, issued orders to, and/or direct, was negligent, breached their duty, departed from accepted standards of care and treatment, and committed malpractice in the care and treatment of Shilo Saunders (the "Mother") and/or infant plaintiff G.B. (the "Infant"), in that he, among other things: failed to timely and properly perform, refer, recommend, and/or order a C-Section; failed to timely and properly order, apply, and maintain continuous use of a Fetal Heart Monitor; failed to timely and properly order, apply, and maintain continuous EFM monitoring; improperly approved, directed, and/or ordered intermittent EFM monitoring; improperly performed intermittent EFM monitoring; failed to timely and properly ensure that the Infant's fetal heart rate was being continuously and properly evaluated, monitored and interpreted; failed to timely and properly apply, order, recommend, and/or refer a fetal scalp electrode; failed to timely and properly obtain interpretable fetal monitoring tracings during the second stage of labor; failed to timely and properly take into account, act on, and/or resolve the lack of proper fetal heart monitoring strips

and the poor quality of the fetal monitoring strips; failed to timely and properly take into account, and resolve the uninterpretable fetal monitoring strips and fetal heart rate; failed to ensure that there were proper quality and interpretable fetal heart monitoring strips and fetal heart rate; failed to timely and properly diagnose, recognize, take into account, and/or act on the fact that the Infant's fetal heart rate was undeterminable, of poor quality, and/or uninterpretable; failed to timely and properly diagnose, recognize, document, take into account, act on, and/or treat the fact that there was underminable baseline, accelerations, decelerations, contractions, and/or variability on the fetal monitoring strips; failed to timely and properly ensure the proper quality of the fetal heart monitoring strips and reading of the fetal heart rate; failed to timely and properly diagnose, recognize, take into account, and/or act on the Infant's decreased variability, minimal variability, lack of variability, lack of healthy accelerations, variable decelerations, late decelerations, recurrent decelerations, signs of hypoxia, fetal distress, non-reassuring fetal heart rate, Category 2 Fetal Heart Monitoring Strips, Category 3 Fetal Heart Monitoring strips, tachysystole, hyperstimulation, trauma, worsening, non-reassuring, distressing, alarming, and dangerous Fetal Heart Rate, worsening Fetal Heart Rate, Fetal Heart Rate that was highly predictive for severe fetal acidemia/hypoxia/ischemia/hypoxemia, metabolic acidosis, poor perfusion, lack of oxygen, and/or the other signs, symptoms, and conditions; failed to timely and appropriately perform, refer, recommend, and/or order a C-Section despite the Infant's Fetal Heart Rate and Fetal Monitoring Strips; failed to timely and appropriately perform, refer, recommend, and/or order a C-Section despite the Infant's Fetal Heart Rate and Fetal Monitoring Strips, decreased variability, minimal variability, lack of variability, lack of healthy accelerations, variable decelerations, late decelerations, recurrent decelerations, signs of hypoxia, fetal distress, non-reassuring fetal heart rate, Category 2 Fetal Heart Monitoring Strips, Category 3 Fetal Heart Monitoring strips,

tachysystole, hyperstimulation, trauma, worsening, non-reassuring, distressing, alarming, and dangerous Fetal Heart Rate, worsening Fetal Heart Rate, Fetal Heart Rate that was highly predictive for severe fetal acidemia/hypoxia/ischemia/hypoxemia, metabolic acidosis, poor perfusion, lack of oxygen, and/or the other signs, symptoms, and conditions; failed to timely and properly diagnose, recognize, take into account, and/or act on the fact that the Infant's Fetal Heart Monitoring Strips had progressed and worsened in stage; failed to timely and properly diagnose, recognize, take into account, and/or act on the need for resuscitative measures to be implemented; failed to timely and properly perform, refer, recommend, implement, and/or order resuscitative measures; failed to timely and properly perform, refer, recommend, implement, and/or order resuscitative measures in light of the Infant's signs, symptoms, and conditions as listed herein, and/or to reverse the Infant's decreased variability, minimal variability, lack of variability, lack of healthy accelerations, variable decelerations, late decelerations, recurrent decelerations, signs of hypoxia, fetal distress, non-reassuring fetal heart rate, Category 2 Fetal Heart Monitoring Strips, Category 3 Fetal Heart Monitoring strips, tachysystole, hyperstimulation, trauma, worsening, non-reassuring, distressing, alarming, and dangerous Fetal Heart Rate, worsening Fetal Heart Rate, Fetal Heart Rate that was highly predictive for severe fetal acidemia/hypoxia/ischemia/hypoxemia, metabolic acidosis, poor perfusion, and/or lack of oxygen; failed to timely and properly determine if the Infant was responsive to resuscitative measures; failed to timely and properly perform, refer, recommend, and/or order a C-Section due the Infant's lack of positive response and/or lack of improvement; failed to timely and properly perform, refer, recommend, and/or order a C-Section due the Infant's lack of positive response and/or improvement to the resuscitative measures that were implemented; failed to timely and properly recognize, diagnose, take into account, and/or act on the Infant's lack of a response to resuscitative measures; negligently permitted the Infant's

abnormal fetal heart rate and fetal heart tracing to persist for an extended period of time; improperly read, interpreted, documented, and charted the Infant's fetal heart monitoring strips, fetal heart rate, and fetal heart tracing; improperly documented the presence of an interpretable strip when there was none; failed to recognize, diagnose, document, and/or chart the Infant's late decelerations, variable decelerations, and/or prolonged decelerations; failed to document and/or chart the poor quality of the fetal monitoring strips, the uninterpretable nature of the fetal monitoring strips, and the undeterminable fetal heart rate; failed to timely and properly take and record the Infant's Fetal Heart Rate, fetal monitoring strips, vital signs, labs, and/or other important, relevant, and/or vital data; failed to timely and properly inspect, examine, and/or evaluate the Mother's Vagina and Uterus; failed to timely and properly inspect, examine, and/or evaluate the Mother's Vagina and Uterus at appropriate intervals; failed to timely and properly recognize, diagnose, take into account, and/or act on the persistent ongoing metabolic acidosis of the Infant; failed to timely and properly perform, refer, recommend, and/or order a C-Section in light of the persistent ongoing metabolic acidosis of the Infant; failed to timely and properly perform, refer, recommend, implement, and/or order the administration of IV fluids to the Mother; failed to timely and properly recognize that the IV had fallen out; failed to timely and properly replace the IV drip after it had fallen out; failed to timely and properly continuously administer IV insulin to the Mother; improperly allowed the Mother's labor to continue without the administration of IV insulin; failed to timely and properly perform, refer, recommend, implement, and/or order hydration to the Mother; failed to timely and properly perform, refer, recommend, implement, and/or order the administration of bolus to the Mother; failed to timely and properly perform, refer, recommend, implement, and/or order the administration of oxygen to the Mother; failed to timely and properly administer, refer, recommend, and/or order appropriate amounts of oxygen for the

Mother; failed to timely and properly perform, refer, recommend, implement, and/or order the changing of positions for the Mother; failed to timely make appropriate assessments; failed to timely come to the Mother's bedside; failed to timely come to the Mother's bedside at appropriate intervals; failed to be present at the birth and delivery of the Infant; failed to timely and properly supervise, oversee, and/or direct the birth and delivery of the Infant; improperly signed off on being present at the birth and delivery of the Infant; failed to come to and/or be at the Mother's bedside during the Mother's labor and/or during the birth and delivery of the Infant; failed to come to and/or be in the Mother's room during the Mother's labor and/or during the birth and delivery of the Infant; failed to timely examine and evaluate the Mother and the Infant; failed to timely examine and evaluate the Mother and the Infant at appropriate intervals; failed to timely and properly diagnose, take into account, recognize, and/or act on the Infant's erratic, dangerous, non-reassuring, distressing, alarming, and worsening Fetal Heart Rate and Fetal Monitoring Strips; negligently allowed the Infant to have decreasing, erratic, distressing, dangerous, non-reassuring, alarming, worsening, and progressively worsening fetal heart rate and fetal monitoring strips for several hours; failed to act or take steps to prevent, eliminate, resolve and end the Infant's decreasing, erratic, distressing, dangerous, non-reassuring, alarming, worsening, and progressively worsening fetal heart rate and fetal monitoring strips; failed to timely and properly diagnose, take into account, recognize, and/or act on the fact that the Mother had a complicated labor and delivery; failed to timely and properly diagnose, take into account, recognize, and/or act on the fact that there were erratic, distressing, dangerous, non-reassuring, alarming, worsening, and progressively worsening signs and symptoms in the Mother and the Infant; failed to timely and properly observe, read, interpret, look at, and/or monitor the fetal heart monitor hooked up to the Mother and/or the Infant's Fetal Heart Rate; failed to timely and properly observe, read, interpret, look at, and/or

monitor the fetal heart monitor hooked up to the Mother and/or the Infant's Fetal Heart Rate at appropriate intervals; failed to timely and appropriately read and interpret the fetal monitoring strips; failed to timely and appropriately act on and/or take into account the findings of the fetal monitoring strips; negligently deprived the Infant of oxygen; failed to timely and properly take into account, diagnose, recognize, and/or act on the Infant's oxygen deprivation; failed to timely and properly perform, recommend, refer, and/or order a C-Section for several hours despite indications that such a C-Section was necessary, called for, and indicated; failed to timely and properly perform, recommend, refer, and/or order perform a C-Section despite hours of erratic, alarming, non-reassuring, dangerous, distressing, and deteriorating Fetal Heart Rate and Fetal Heart Monitoring Strips; negligently delayed and waited until approximately 20:58 on October 1, 2005, to deliver the Infant; failed to properly extract the Infant in a timely manner; failed to timely and properly keep up to date on the standards of care in obstetrics, fetal monitoring strips, signs of hypoxia, signs of fetal distress, the indications for and performance of a C-Section, chain of command, communication with nurses, and/or other relevant obstetrical areas; failed to timely and properly take into account, diagnose, recognize, and/or act on the progressively worsening and alarming Fetal Heart Rate and Fetal Heart Monitoring Strips; failed to timely and properly follow up on, remain aware of, and/or re-examine the Mother and the Infant and their signs, symptoms, and conditions; failed to timely and properly follow up on, remain aware of, and/or re-examine the Mother and the Infant, the Mother's labor and delivery status, and the Mother's and Infant's signs, symptoms, and conditions at appropriate intervals; failed to timely and properly diagnose, recognize, take into account, act on, and treat the cord wrapped around the Infant's neck; caused the cord to be wrapped around the Infant's neck; failed to timely and properly perform, refer, order, and/or recommend a C-section due to the cord being wrapped around the Infant's neck; negligently

ordered, recommended, and/or administered Pitocin; negligently ordered, recommended, and/or administered Pitocin despite the fact that it was contraindicated; failed to timely and properly come and/or be at the Mother's bedside despite the fact that Pitocin was being administered to the Mother; failed to timely and properly evaluate, assess, and/or examine the Mother, the Infant, and/or the fetal monitoring strips despite the fact that Pitocin was being administered to the Mother; violated Crouse Hospital's policies, procedures, and/or protocols regarding the administration of Pitocin; negligently ordered, recommended, and/or administered Pitocin despite the Infant's signs, symptoms, conditions, fetal heart monitoring strips, fetal heart rate, fetal distress, and/or other signs, symptoms conditions as listed herein; failed to timely and properly order the stoppage, recommend the stoppage, and/or stop the administration of Pitocin; negligently caused hyperstimulation and/or tachysystole of the Mother's uterus; failed to timely and properly diagnose, recognize, take into account, and/or act on the presence of hyperstimulation and/or tachysystole; negligently caused the Infant to experience trauma and/or birth trauma; failed to timely and properly diagnose, recognize, take into account, and/or act the Infant's trauma and/or birth trauma; failed to timely and properly diagnose, recognize, take into account, and/or act on the fact that the Mother's labor was and/or had become "high" risk; failed to timely and properly diagnose, recognize, take into account, and/or act on the fact that the Mother's labor was "high" risk secondary to the existence of a hostile intrauterine environment, the alarming, dangerous, non-reassuring, dangerous, and worsening Fetal Heart Rate and Fetal Monitoring Strips, tachysystole, and/or the other conditions listed herein; negligently and inappropriately exposed the Infant to a hostile intrauterine environment; failed to timely and properly remove the Infant from such hostile environment; failed to timely obtain appropriate consultations; failed to timely and properly communicate with and/or inform Dr. Robert Silverman, Dr. Richard Aubry, and/or other

18

obstetricians, maternal fetal medicine physicians, and/or other specialists regarding the Mother's and the Infant's signs, symptoms, and/or conditions; failed to timely and properly seek the guidance and/or assistance of Dr. Robert Silverman, Dr. Richard Aubry, and/or other obstetricians, maternal fetal medicine physicians, and/or other specialists; inappropriately delegated responsibility to examine, treat, monitor, and evaluate the Mother and the Infant; inappropriately delegated responsibility to examine, treat, monitor, and evaluate Mother and Infant to nurses, fellows, and/or residents; failed to give proper instructions to the nurses, residents, and/or fellows; failed to give proper instruction as to when he, Obstetricians, attendings, Maternal Fetal Medicine doctors, residents, fellows, and/or other doctors should be notified, called to the bedside, and/or consulted with; failed to give proper instructions to the nurses, residents, and/or fellows regarding signs of fetal distress and conditions when he, Obstetricians, attendings, Maternal Fetal Medicine doctors, residents, fellows, and/or other doctors should be notified to come to the Mother's bedside; failed to actually be present at, be involved in, and/or perform the delivery of the Infant; negligently and inappropriately failed to adhere to the policies, procedures, and protocols of Crouse Hospital; failed and neglected to use reasonable care to properly treat, care for, observe, administer to, diagnose, test, and/or otherwise treat the Mother and the Infant for the conditions with which they presented; negligently failed to carefully, timely, properly, thoroughly, and fully evaluate the signs, symptoms and conditions manifested in the Mother and the Infant; negligently failed to use reasonable care to timely realize, recognize, be cognizant of, or be aware of the conditions from which the Mother and the Infant were suffering; negligently failed to use reasonable care to timely diagnose and render the proper, appropriate, and indicated course of treatment for the Mother and the Infant based upon their physical presentation, signs, symptoms, and complaints; negligently failed to use reasonable care in the services, delivery, diagnoses, treatment and care rendered to the Mother

and the Infant; failed and neglected to use reasonable care heeding the Mother's and the Infant's signs, symptoms, conditions, and complaints; negligently departed from accepted medical, surgical, obstetrical, gynecological, and hospital practices in the services, delivery, treatment, and diagnoses rendered to the Mother and the Infant; negligently failed to use reasonable care to follow good practices; performed contraindicated procedures upon the Mother and the Infant; failed to perform indicated procedures in a proper and timely manner; performed procedures negligently upon the Mother and the Infant; failed to timely and properly assess the Mother's condition pre-delivery, during delivery, and after delivery; failed to properly to timely and appropriately treat the Infant after he was born; failed to have Pediatricians, NICU Physicians, and/or other appropriate physicians at the Mother's bedside at the time of delivery of the Infant; failed to timely and appropriately transfer the Infant to the neo-natal intensive care unit; failed to properly and carefully perform delivery and other medical, obstetrical and gynecological, and hospital care; failed to properly and carefully perform the delivery of the Infant; negligently administered and/or ordered medication to the Mother and the Infant; negligently permitted and caused the Infant to sustain trauma; failed to timely and properly recognize the damage and injury that occurred during the birthing process; failed to timely and properly obtain the informed consent of the Infant and/or her representatives; failed to timely and properly make the Mother and/or her representatives aware of all those perils and dangers which would have allowed her to make an informed consent and would have allowed her and/or her representatives to consider any alternative form of treatment then available; failed to timely and properly warn and inform the Mother and/or her representatives of the high risk nature of her pregnancy, the danger of persisting with a natural birth, the danger of not having a C-Section, and/or the danger of not timely switching from a natural birth to a C-Section in the presence of dangerous and alarming conditions; failed to timely and properly warn and inform the Mother

and/or her representatives regarding the significance of and the dangerous, alarming, and non-reassuring status of the Infant's Fetal Heart Rate and Fetal Monitoring Strips; failed to timely and properly warn and inform the Mother and/or her representatives regarding the presence of, significance of, the dangers of, and the risks of the Mother's and Infant's signs, symptoms, and conditions, including, decreased variability, minimal variability, lack of variability, lack of healthy accelerations, variable decelerations, late decelerations, recurrent decelerations, signs of hypoxia, fetal distress, non-reassuring fetal heart rate, Category 2 Fetal Heart Monitoring Strips, Category 3 Fetal Heart Monitoring strips, tachysystole, hyperstimulation, trauma, worsening, non-reassuring, distressing, alarming, and dangerous Fetal Heart Rate, worsening Fetal Heart Rate, Fetal Heart Rate that was highly predictive for severe fetal acidemia/hypoxia/ischemia/hypoxemia, metabolic acidosis, poor perfusion, lack of oxygen, and the Infant's and Mother's other signs, symptoms, and conditions; failed to timely and properly make an adequate disclosure in that the Mother and/or her representatives were not made aware of all those known perils or dangers that would have allowed her and/or her representatives to make an informed consent as well as any treatment that was available, particularly with regards to her pregnancy and a C-Section; failed to timely and properly inform and warn the Mother and/or her representatives as to what side effects and complications might occur, including with regards to the continuation of a natural delivery; failed to timely and properly warn and inform the Mother and/or her representatives of the nature and extent of the Infant being born with birth defects and developmental delays; failed to timely and properly warn and inform the Mother and/or her representatives of the reasonably foreseeable risks, benefits and alternatives incidental to the treatment rendered to the Mother; failed to timely and properly inform the Mother and/or her representatives of the alternative methods of treatment, including a C-Section and other methods of expedited delivery of the Infant; failed to timely and

properly inform the Mother and/or her representatives of the importance of and/or need for continuous monitoring, intra-uterine pressure catheter, internal fetal monitor, and/or fetal scalp electrode; failed to timely and properly inform the Mother and/or her representatives regarding the indications for, necessity for, and benefits of a C-Section; failed to timely and properly inform the Mother and/or her representatives regarding the alternative treatment of C-Section; negligently caused the Infant to suffer significant neurological and developmental problems; failed to timely and properly perform and/or order a C-Section on the Mother after being informed of, becoming aware of, and/or recognizing the Mother's and Infant's signs, symptoms, and conditions; negligently waited until 20:58 on October 1, 2005, to deliver the Infant despite being informed of, becoming aware of, the presence of, and/or recognizing the Mother's and Infant's signs, symptoms, and conditions, including those listed herein; failed to timely and properly supervise the residents, fellows, and nurses; failed to timely and properly diagnose, recognize, take into account, and act on the need for a C-section, the need for immediate delivery, the fetal distress, hypoxia, lack of proper utero-placental perfusion, the high risk for brain injury for the Infant, an unhealthy infant, Category II and Category III fetal monitoring strips, and/or the other conditions listed in this answer; being negligent, in all other manners, with respect to the care and treatment that was provided to the Mother and the Infant; committed negligence and medical malpractice in numerous other ways; and/or proximately caused the Infant's injuries.

70. From on or about September 30, 2005, through on or about October 1, 2005, defendant United States, and/or its employees, servants, agents, and/or contractors, and/or through SCHC, its federally funded health centers and clinic, and/or through SCHC's employees, servants, agents, and/or contractors, and/or through those they supervised, issued orders to, and/or directed, and/or through those they were supposed to supervise, issued orders to, and/or direct, were

negligent, breached their duty, departed from accepted standards of care and treatment, and committed malpractice in the care and treatment of Shilo Saunders (the "Mother") and/or infant plaintiff G.B. (the "Infant"), in that they, among other things: failed to timely and properly perform, refer, recommend, and/or order a C-Section; failed to timely and properly order, apply, and maintain continuous use of a Fetal Heart Monitor; failed to timely and properly order, apply, and maintain continuous EFM monitoring; improperly approved, directed, and/or ordered intermittent EFM monitoring; improperly performed intermittent EFM monitoring; failed to timely and properly ensure that the Infant's fetal heart rate was being continuously and properly evaluated, monitored and interpreted; failed to timely and properly apply, order, recommend, and/or refer a fetal scalp electrode; failed to timely and properly obtain interpretable fetal monitoring tracings during the second stage of labor; failed to timely and properly take into account, act on, and/or resolve the lack of proper fetal heart monitoring strips and the poor quality of the fetal monitoring strips; failed to timely and properly take into account, and resolve the uninterpretable fetal monitoring strips and fetal heart rate; failed to ensure that there were proper quality and interpretable fetal heart monitoring strips and fetal heart rate; failed to timely and properly diagnose, recognize, take into account, and/or act on the fact that the Infant's fetal heart rate was undeterminable, of poor quality, and/or uninterpretable; failed to timely and properly ensure the proper quality of the fetal heart monitoring strips and reading of the fetal heart rate; failed to timely and properly diagnose, recognize, take into account, and/or act on the Infant's decreased variability, minimal variability, lack of variability, lack of healthy accelerations, variable decelerations, late decelerations, recurrent decelerations, signs of hypoxia, fetal distress, non-reassuring fetal heart rate, Category 2 Fetal Heart Monitoring Strips, Category 3 Fetal Heart Monitoring strips, tachysystole, hyperstimulation, trauma, worsening, non-reassuring, distressing,

alarming, and dangerous Fetal Heart Rate, worsening Fetal Heart Rate, Fetal Heart Rate that was highly predictive for severe fetal acidemia/hypoxia/ischemia/hypoxemia, metabolic acidosis, poor perfusion, lack of oxygen, and/or the other signs, symptoms, and conditions; failed to timely and appropriately perform, refer, recommend, and/or order a C-Section despite the Infant's Fetal Heart Rate and Fetal Monitoring Strips; failed to timely and appropriately perform, refer, recommend, and/or order a C-Section despite the Infant's Fetal Heart Rate and Fetal Monitoring Strips, decreased variability, minimal variability, lack of variability, lack of healthy accelerations, variable decelerations, late decelerations, recurrent decelerations, signs of hypoxia, fetal distress, non-reassuring fetal heart rate, Category 2 Fetal Heart Monitoring Strips, Category 3 Fetal Heart Monitoring strips, tachysystole, hyperstimulation, trauma, worsening, non-reassuring, distressing, alarming, and dangerous Fetal Heart Rate, worsening Fetal Heart Rate, Fetal Heart Rate that was highly predictive for severe fetal acidemia/hypoxia/ischemia/hypoxemia, metabolic acidosis, poor perfusion, lack of oxygen, and/or the other signs, symptoms, and conditions; failed to timely and properly diagnose, recognize, take into account, and/or act on the fact that the Infant's Fetal Heart Monitoring Strips had progressed and worsened in stage; failed to timely and properly diagnose, recognize, take into account, and/or act on the need for resuscitative measures to be implemented; failed to timely and properly perform, refer, recommend, implement, and/or order resuscitative measures; failed to timely and properly perform, refer, recommend, implement, and/or order resuscitative measures in light of the Infant's signs, symptoms, and conditions as listed herein, and/or to reverse the Infant's decreased variability, minimal variability, lack of variability, lack of healthy accelerations, variable decelerations, late decelerations, recurrent decelerations, signs of hypoxia, fetal distress, non-reassuring fetal heart rate, Category 2 Fetal Heart Monitoring Strips, Category 3 Fetal Heart Monitoring strips, tachysystole, hyperstimulation, trauma, worsening, non-

reassuring, distressing, alarming, and dangerous Fetal Heart Rate, worsening Fetal Heart Rate, Fetal Heart Rate that was highly predictive for severe fetal acidemia/hypoxia/ischemia/hypoxemia, metabolic acidosis, poor perfusion, and/or lack of oxygen; failed to timely and properly determine if the Infant was responsive to resuscitative measures; failed to timely and properly perform, refer, recommend, and/or order a C-Section due the Infant's lack of positive response and/or lack of improvement; failed to timely and properly perform, refer, recommend, and/or order a C-Section due the Infant's lack of positive response and/or improvement to the resuscitative measures that were implemented; failed to timely and properly recognize, diagnose, take into account, and/or act on the Infant's lack of a response to resuscitative measures; negligently permitted the Infant's abnormal fetal heart rate and fetal heart tracing to persist for an extended period of time; improperly read, interpreted, documented, and charted the Infant's fetal heart monitoring strips, fetal heart rate, and fetal heart tracing; improperly documented the presence of an interpretable strip when there was none; failed to recognize, diagnose, document, and/or chart the Infant's late decelerations, variable decelerations, and/or prolonged decelerations; failed to document and/or chart the poor quality of the fetal monitoring strips, the uninterpretable nature of the fetal monitoring strips, and the undeterminable fetal heart rate; failed to timely and properly diagnose, recognize, document, take into account, act on, and/or treat the fact that there was underminable baseline, accelerations, decelerations, contractions, and/or variability on the fetal monitoring strips; failed to timely and properly take and record the Infant's Fetal Heart Rate, fetal monitoring strips, vital signs, labs, and/or other important, relevant, and/or vital data; failed to timely and properly inspect, examine, and/or evaluate the Mother's Vagina and Uterus; failed to timely and properly inspect, examine, and/or evaluate the Mother's Vagina and Uterus at appropriate intervals; failed to timely and properly inspect, examine, and/or evaluate the Mother's contraction,

contraction quality, contraction strength, contraction intensity, contraction duration, and/or time period between contractions; failed to timely and properly inspect, examine, and/or evaluate the Mother's contraction, contraction quality, contraction strength, contraction intensity, contraction duration, and/or time period between contractions; failed to timely and properly recognize, diagnose, take into account, and/or act on the persistent ongoing metabolic acidosis of the Infant; failed to timely and properly perform, refer, recommend, and/or order a C-Section in light of the persistent ongoing metabolic acidosis of the Infant; failed to timely and properly perform, refer, recommend, implement, and/or order the administration of IV fluids to the Mother; failed to timely and properly recognize that the IV had fallen out; failed to timely and properly replace the IV drip after it had fallen out; failed to timely and properly continuously administer IV insulin to the Mother; improperly allowed the Mother's labor to continue without the administration of IV insulin; failed to timely and properly perform, refer, recommend, implement, and/or order hydration to the Mother; failed to timely and properly perform, refer, recommend, implement, and/or order the administration of bolus to the Mother; failed to timely and properly perform, refer, recommend, implement, and/or order the administration of oxygen to the Mother; failed to timely and properly administer, refer, recommend, and/or order appropriate amounts of oxygen for the Mother; failed to timely and properly perform, refer, recommend, implement, and/or order the changing of positions for the Mother; failed to timely make appropriate assessments; failed to timely come to the Mother's bedside; failed to timely come to the Mother's bedside at appropriate intervals; failed to be present at the birth and delivery of the Infant; failed to timely and properly supervise, oversee, and/or direct the birth and delivery of the Infant; improperly signed off on being present at the birth and delivery of the Infant; failed to come to and/or be at the Mother's bedside during the Mother's labor and/or during the birth and delivery of the Infant; failed to come

to and/or be in the Mother's room during the Mother's labor and/or during the birth and delivery of the Infant; failed to timely examine and evaluate the Mother and the Infant; failed to timely examine and evaluate the Mother and the Infant at appropriate intervals; failed to timely and properly diagnose, take into account, recognize, and/or act on the Infant's erratic, dangerous, non-reassuring, distressing, alarming, and worsening Fetal Heart Rate and Fetal Monitoring Strips; negligently allowed the Infant to have decreasing, erratic, distressing, dangerous, non-reassuring, alarming, worsening, and progressively worsening fetal heart rate and fetal monitoring strips for several hours; failed to act or take steps to prevent, eliminate, resolve and end the Infant's decreasing, erratic, distressing, dangerous, non-reassuring, alarming, worsening, and progressively worsening fetal heart rate and fetal monitoring strips; failed to timely and properly diagnose, take into account, recognize, and/or act on the fact that the Mother had a complicated labor and delivery; failed to timely and properly diagnose, take into account, recognize, and/or act on the fact that there were erratic, distressing, dangerous, non-reassuring, alarming, worsening, and progressively worsening signs and symptoms in the Mother and the Infant; failed to timely and properly observe, read, interpret, look at, and/or monitor the fetal heart monitor hooked up to the Mother and/or the Infant's Fetal Heart Rate; failed to timely and properly observe, read, interpret, look at, and/or monitor the fetal heart monitor hooked up to the Mother and/or the Infant's Fetal Heart Rate at appropriate intervals; failed to timely and appropriately read and interpret the fetal monitoring strips; failed to timely and appropriately act on and/or take into account the findings of the fetal monitoring strips; negligently deprived the Infant of oxygen; failed to timely and properly take into account, diagnose, recognize, and/or act on the Infant's oxygen deprivation; failed to timely and properly perform, recommend, refer, and/or order a C-Section for several hours despite indications that such a C-Section was necessary, called for, and indicated; failed to timely and properly perform,

recommend, refer, and/or order perform a C-Section despite hours of erratic, alarming, non-reassuring, dangerous, distressing, and deteriorating Fetal Heart Rate and Fetal Heart Monitoring Strips; negligently delayed and waited until approximately 20:58 on October 1, 2005, to deliver the Infant; failed to properly extract the Infant in a timely manner; failed to timely and properly keep up to date on the standards of care in obstetrics, fetal monitoring strips, signs of hypoxia, signs of fetal distress, the indications for and performance of a C-Section, chain of command, communication with nurses, and/or other relevant obstetrical areas; failed to timely and properly take into account, diagnose, recognize, and/or act on the progressively worsening and alarming Fetal Heart Rate and Fetal Heart Monitoring Strips; failed to timely and properly follow up on, remain aware of, and/or re-examine the Mother and the Infant and their signs, symptoms, and conditions; failed to timely and properly follow up on, remain aware of, and/or re-examine the Mother and the Infant, the Mother's labor and delivery status, and the Mother's and Infant's signs, symptoms, and conditions at appropriate intervals; failed to timely and properly diagnose, recognize, take into account, act on, and treat the cord wrapped around the Infant's neck; caused the cord to be wrapped around the Infant's neck; failed to timely and properly perform, refer, order, and/or recommend a C-section due to the cord being wrapped around the Infant's neck; negligently ordered, recommended, and/or administered Pitocin; negligently ordered, recommended, and/or administered Pitocin despite the fact that it was contraindicated; failed to timely and properly come and/or be at the Mother's bedside despite the fact that Pitocin was being administered to the Mother; failed to timely and properly evaluate, assess, and/or examine the Mother, the Infant, and/or the fetal monitoring strips despite the fact that Pitocin was being administered to the Mother; violated Crouse Hospital's policies, procedures, and/or protocols regarding the administration of Pitocin; negligently ordered, recommended, and/or administered Pitocin despite

the Infant's signs, symptoms, conditions, fetal heart monitoring strips, fetal heart rate, fetal distress, and/or other signs, symptoms conditions as listed herein; failed to timely and properly order the stoppage, recommend the stoppage, and/or stop the administration of Pitocin; negligently caused hyperstimulation and/or tachysystole of the Mother's uterus; failed to timely and properly diagnose, recognize, take into account, and/or act on the presence of hyperstimulation and/or tachysystole; negligently caused the Infant to experience trauma and/or birth trauma; failed to timely and properly diagnose, recognize, take into account, and/or act the Infant's trauma and/or birth trauma; failed to timely and properly diagnose, recognize, take into account, and/or act on the fact that the Mother's labor was and/or had become "high" risk; failed to timely and properly diagnose, recognize, take into account, and/or act on the fact that the Mother's labor was "high" risk secondary to the existence of a hostile intrauterine environment, the alarming, dangerous, non-reassuring, dangerous, and worsening Fetal Heart Rate and Fetal Monitoring Strips, tachysystole, and/or the other conditions listed herein; negligently and inappropriately exposed the Infant to a hostile intrauterine environment; failed to timely and properly remove the Infant from such hostile environment; failed to timely obtain appropriate consultations; failed to timely and properly communicate with and/or inform Dr. Robert Silverman, Dr. Richard Aubry, and/or other obstetricians, maternal fetal medicine physicians, and/or other specialists regarding the Mother's and the Infant's signs, symptoms, and/or conditions; failed to timely and properly seek the guidance and/or assistance of Dr. Robert Silverman, Dr. Richard Aubry, and/or other obstetricians, maternal fetal medicine physicians, and/or other specialists; inappropriately delegated responsibility to examine, treat, monitor, and evaluate the Mother and the Infant; inappropriately delegated responsibility to examine, treat, monitor, and evaluate Mother and Infant to nurses, fellows, and/or residents; failed to give proper instructions to the nurses, residents, and/or fellows;

failed to give proper instruction as to when he, Obstetricians, attendings, Maternal Fetal Medicine doctors, residents, fellows, and/or other doctors should be notified, called to the bedside, and/or consulted with; failed to give proper instructions to the nurses, residents, and/or fellows regarding signs of fetal distress and conditions when he, Obstetricians, attendings, Maternal Fetal Medicine doctors, residents, fellows, and/or other doctors should be notified to come to the Mother's bedside; failed to actually be present at, be involved in, and/or perform the delivery of the Infant; negligently and inappropriately failed to adhere to the policies, procedures, and protocols of Crouse Hospital; failed and neglected to use reasonable care to properly treat, care for, observe, administer to, diagnose, test, and/or otherwise treat the Mother and the Infant for the conditions with which they presented; negligently failed to carefully, timely, properly, thoroughly, and fully evaluate the signs, symptoms and conditions manifested in the Mother and the Infant; negligently failed to use reasonable care to timely realize, recognize, be cognizant of, or be aware of the conditions from which the Mother and the Infant were suffering; negligently failed to use reasonable care to timely diagnose and render the proper, appropriate, and indicated course of treatment for the Mother and the Infant based upon their physical presentation, signs, symptoms, and complaints; negligently failed to use reasonable care in the services, delivery, diagnoses, treatment and care rendered to the Mother and the Infant; failed and neglected to use reasonable care heeding the Mother's and the Infant's signs, symptoms, conditions, and complaints; negligently departed from accepted medical, surgical, obstetrical, gynecological, and hospital practices in the services, delivery, treatment, and diagnoses rendered to the Mother and the Infant; negligently failed to use reasonable care to follow good practices; performed contraindicated procedures upon the Mother and the Infant; failed to perform indicated procedures in a proper and timely manner; performed procedures negligently upon the Mother and the Infant; failed to timely and properly assess the Mother's condition pre-delivery,

during delivery, and after delivery; failed to properly to timely and appropriately treat the Infant after he was born; failed to have Pediatricians, NICU Physicians, and/or other appropriate physicians at the Mother's bedside at the time of delivery of the Infant; failed to timely and appropriately transfer the Infant to the neo-natal intensive care unit; failed to properly and carefully perform delivery and other medical, obstetrical and gynecological, and hospital care; failed to properly and carefully perform the delivery of the Infant; negligently administered and/or ordered medication to the Mother and the Infant; negligently permitted and caused the Infant to sustain trauma; failed to timely and properly recognize the damage and injury that occurred during the birthing process; failed to timely and properly obtain the informed consent of the Infant and/or her representatives; failed to timely and properly make the Mother and/or her representatives aware of all those perils and dangers which would have allowed her to make an informed consent and would have allowed her and/or her representatives to consider any alternative form of treatment then available; failed to timely and properly warn and inform the Mother and/or her representatives of the high risk nature of her pregnancy, the danger of persisting with a natural birth, the danger of not having a C-Section, and/or the danger of not timely switching from a natural birth to a C-Section in the presence of dangerous and alarming conditions; failed to timely and properly warn and inform the Mother and/or her representatives regarding the significance of and the dangerous, alarming, and non-reassuring status of the Infant's Fetal Heart Rate and Fetal Monitoring Strips; failed to timely and properly warn and inform the Mother and/or her representatives regarding the presence of, significance of, the dangers of, and the risks of the Mother's and Infant's signs, symptoms, and conditions, including, decreased variability, minimal variability, lack of variability, lack of healthy accelerations, variable decelerations, late decelerations, recurrent decelerations, signs of hypoxia, fetal distress, non-reassuring fetal heart rate, Category 2 Fetal Heart Monitoring Strips, Category

3 Fetal Heart Monitoring strips, tachysystole, hyperstimulation, trauma, worsening, non-reassuring, distressing, alarming, and dangerous Fetal Heart Rate, worsening Fetal Heart Rate, Fetal Heart Rate that was highly predictive for severe fetal acidemia/hypoxia/ischemia/hypoxemia, metabolic acidosis, poor perfusion, lack of oxygen, and the Infant's and Mother's other signs, symptoms, and conditions; failed to timely and properly make an adequate disclosure in that the Mother and/or her representatives were not made aware of all those known perils or dangers that would have allowed her and/or her representatives to make an informed consent as well as any treatment that was available, particularly with regards to her pregnancy and a C-Section; failed to timely and properly inform and warn the Mother and/or her representatives as to what side effects and complications might occur, including with regards to the continuation of a natural delivery; failed to timely and properly warn and inform the Mother and/or her representatives of the nature and extent of the Infant being born with birth defects and developmental delays; failed to timely and properly warn and inform the Mother and/or her representatives of the reasonably foreseeable risks, benefits and alternatives incidental to the treatment rendered to the Mother; failed to timely and properly inform the Mother and/or her representatives of the alternative methods of treatment, including a C-Section and other methods of expedited delivery of the Infant; failed to timely and properly inform the Mother and/or her representatives of the importance of and/or need for continuous monitoring, intra-uterine pressure catheter, internal fetal monitor, and/or fetal scalp electrode;  failed to timely and properly inform the Mother and/or her representatives regarding the indications for, necessity for, and benefits of a C-Section; failed to timely and properly inform the Mother and/or her representatives regarding the alternative treatment of C-Section; negligently caused the Infant to suffer significant neurological and developmental problems; failed to timely and properly perform and/or order a C-Section on the Mother after being informed of, becoming aware

of, and/or recognizing the Mother's and Infant's signs, symptoms, and conditions; negligently waited until 20:58 on October 1, 2005, to deliver the Infant despite being informed of, becoming aware of, the presence of, and/or recognizing the Mother's and Infant's signs, symptoms, and conditions, including those listed herein; failed to timely and properly supervise the residents, fellows, and nurses; failed to timely and properly diagnose, recognize, take into account, and act on the need for a C-section, the need for immediate delivery, the fetal distress, hypoxia, lack of proper utero-placental perfusion, the high risk for brain injury for the Infant, an unhealthy infant, Category II and Category III fetal monitoring strips, and/or the other conditions listed in this answer; being negligent, in all other manners, with respect to the care and treatment that was provided to the Mother and the Infant; committed negligence and medical malpractice in numerous other ways; and/or proximately caused the Infant's injuries.

71.     The Defendants are jointly and severally liable with the defendants in the State Court Action.

72.     This action falls within one or more of the exceptions set forth in CPLR §1602, and as such the Defendants are jointly and severally liable pursuant to the exceptions set forth in Article 16 of the CPLR.

73.     Pursuant to CPLR §1602 (2)(iv), the Defendants are jointly and severally liable for all of Plaintiffs' damages, including by not limited to, Plaintiffs' non-economic loss, irrespective of the provisions of CPLR §1601, by reason of the fact that the Defendants owed Plaintiffs a non-delegable duty of care.

74.     Pursuant to CPLR §1602 (2)(iv), the Defendants are jointly and severally liable for all of Plaintiffs' damages, including but not limited to, Plaintiffs' non-economic loss, irrespective of the

provisions of CPLR §1601, by reason of the fact that the Defendants are vicariously liable for the negligent acts and omissions of their servants, agents, affiliated physicians and/or employees.

75.     Pursuant to CPLR §1602(7), the Defendants are jointly and severally liable for all of Plaintiffs' damages, including but not limited to, Plaintiffs' non-economic loss, irrespective of the provisions of CPLR §1601, by reason of the fact that the Defendants acted with reckless disregard for the safety of others, namely the Plaintiffs herein.

76.     By reason of the foregoing, and as a proximate cause of the foregoing, plaintiff G.B. suffered serious personal injuries, conscious pain and suffering, great pain, agony, mental anguish, emotional distress, hospitalizations, physical impairment, disability, brain damage, developmental delays, lost wages, medical expenses, pecuniary damages, and other injuries and damages, including hypoxia, ischemia, anoxia, asphyxia, acidemia, hypoxemia, cord wrapped around neck, hypoxic ischemic encephalopathy, lack of oxygen to the brain, lack of and decreased tone, need for resuscitation, need for supplemental oxygen, bruising, bruising of left and right arms, birth trauma, head trauma, physical disabilities, breathing problems, hypotension, cerebral palsy, brain damage, cognitive delays, developmental delays, decreases in cognitive ability, expressive language delays, developmental language disorders, verbal apraxia, speech articulation issues, speech/language impairments, need for educational therapy, need for speech/language therapy, unintelligibility of language and speech, learning disabilities, educational difficulties, need for special education, neurodevelopmental abnormalities, delayed and decreased ability to get thoughts onto paper, delayed and decreased math ability, delayed and decreased reading ability, delayed and decreased written and oral expression, long processing time, motor delays, developmental dyspraxia, developmental coordination disorder, hemiplegia, right spastic hemiplegia, asymmetry in upper extremity function, tightness of ankle, RLE and LLE dysfunction,

limitations, and/or disabilities, fine motor skills delays and disabilities, decreased gross motor skills, need for occupational therapy, need for physical therapy, delays and decreased motor functioning, difficulty with toilet training and wiping, encopresis, constipation, abnormal GI motility, GI dysfunction, need for pain medication, decreased motor function, decreased strength, flexibility, mobility, and endurance, decreased ability in activities of daily living, emotional distress, frustration, embarrassment, anxiety, mental anguish, decreased ability to work, future lost wages, loss of future fringe benefits, loss of future earning capacity, loss of enjoyment of life, medical expenses, need for extensive medical care, economic damages, and numerous other injuries and damages.

77.     By reason of the above, Plaintiffs bring this action for plaintiff G.B.'s conscious pain and suffering and injuries, emotional distress, and for damages, both general and special, in the sum of $45,000,000.00.

78.     The defendants including defendant United States, SCHC, and/or Dr. Scott are liable pursuant to 28 U.S.C. § 1346(b)(1).

## AS AND FOR A SECOND CAUSE OF ACTION

79.     Plaintiffs reallege and reincorporate each and every allegation above as if fully set forth herein.

80.     SCHC was negligent in hiring, retaining, granting privileges to, renewing privileges to, monitoring, and/or supervising medical personnel, including, but not limited to, Dr. Scott, who were careless, unskillful, negligent, and who did not possess the requisite knowledge and skill of medical professionals in the community.

81.     Defendant United States of America was negligent in hiring, retaining, granting privileges to, renewing privileges to, monitoring, and/or supervising medical personnel who were

careless, unskillful, negligent, and who did not possess the requisite knowledge and skill of medical professionals in the community.

82.     The Defendants are jointly and severally liable with the defendants in the State Court Action.

83.     This action falls within one or more of the exceptions set forth in CPLR §1602, and as such the Defendants are jointly and severally liable pursuant to the exceptions set forth in Article 16 of the CPLR.

84.     Pursuant to CPLR §1602 (2)(iv), the Defendants are jointly and severally liable for all of Plaintiffs' damages, including by not limited to, Plaintiffs' non-economic loss, irrespective of the provisions of CPLR §1601, by reason of the fact that the Defendants owed Plaintiffs a non-delegable duty of care.

85.     Pursuant to CPLR §1602 (2)(iv), the Defendants are jointly and severally liable for all of Plaintiffs' damages, including but not limited to, Plaintiffs' non-economic loss, irrespective of the provisions of CPLR §1601, by reason of the fact that the Defendants are vicariously liable for the negligent acts and omissions of their servants, agents, affiliated physicians and/or employees.

86.     Pursuant to CPLR §1602(7), the Defendants are jointly and severally liable for all of Plaintiffs' damages, including but not limited to, Plaintiffs' non-economic loss, irrespective of the provisions of CPLR §1601, by reason of the fact that the Defendants acted with reckless disregard for the safety of others, namely the Plaintiffs herein.

87.     By reason of the foregoing, and as a proximate cause of the foregoing, plaintiff G.B. suffered serious personal injuries, conscious pain and suffering, great pain, agony, mental anguish, emotional distress, hospitalizations, physical impairment, disability, brain damage, developmental delays, lost wages, medical expenses, pecuniary damages, and other injuries and

damages, including hypoxia, ischemia, anoxia, asphyxia, acidemia, hypoxemia, cord wrapped around neck, hypoxic ischemic encephalopathy, lack of oxygen to the brain, lack of and decreased tone, need for resuscitation, need for supplemental oxygen, bruising, bruising of left and right arms, birth trauma, head trauma, physical disabilities, breathing problems, hypotension, cerebral palsy, brain damage, cognitive delays, developmental delays, decreases in cognitive ability, expressive language delays, developmental language disorders, verbal apraxia, speech articulation issues, speech/language impairments, need for educational therapy, need for speech/language therapy, unintelligibility of language and speech, learning disabilities, educational difficulties, need for special education, neurodevelopmental abnormalities, delayed and decreased ability to get thoughts onto paper, delayed and decreased math ability, delayed and decreased reading ability, delayed and decreased written and oral expression, long processing time, motor delays, developmental dyspraxia, developmental coordination disorder, hemiplegia, right spastic hemiplegia, asymmetry in upper extremity function, tightness of ankle, RLE and LLE dysfunction, limitations, and/or disabilities, fine motor skills delays and disabilities, decreased gross motor skills, need for occupational therapy, need for physical therapy, delays and decreased motor functioning, difficulty with toilet training and wiping, encopresis, constipation, abnormal GI motility, GI dysfunction, need for pain medication, decreased motor function, decreased strength, flexibility, mobility, and endurance, decreased ability in activities of daily living, emotional distress, frustration, embarrassment, anxiety, mental anguish, decreased ability to work, future lost wages, loss of future fringe benefits, loss of future earning capacity, loss of enjoyment of life, medical expenses, need for extensive medical care, economic damages, and numerous other injuries and damages.

88.     By reason of the above, Plaintiffs bring this action for plaintiff G.B.'s conscious pain and suffering and injuries, emotional distress, and for damages, both general and special, in the sum of $45,000,000.00.

89.     The defendants including defendant United States, SCHC, and/or Dr. Scott are liable pursuant to 28 U.S.C. § 1346(b)(1).

## AS AND FOR A THIRD CAUSE OF ACTION

90.     Plaintiffs reallege and reincorporate each and every allegation above as if fully set forth herein.

91.     Dr. Scott, through his agents, servants, employees, and/or contractors, and/or through those he supervised, issued orders to, and/or directed, and/or through those he was supposed to supervise, issued orders to, and/or direct, failed to inform the Plaintiffs and/or their representatives of the reasonably foreseeable risks and benefits of, and alternatives to, the treatment proposed and rendered, which would have been disclosed by a reasonable medical practitioner in similar circumstances, in consequence of which defendants failed to obtain an informed consent thereto.

92.     SCHC, and/or its agents, servants, employees, and/or contractors, and/or through those they supervised, issued orders to, and/or directed, and/or through those they were supposed to supervise, issued orders to, and/or direct, failed to inform the Plaintiffs and/or their representatives of the reasonably foreseeable risks and benefits of, and alternatives to, the treatment proposed and rendered, which would have been disclosed by a reasonable medical practitioner in similar circumstances, in consequence of which defendants failed to obtain an informed consent thereto.

93.     Defendant United States, and/or its employees, servants, agents, and/or contractors, and/or through SCHC, its federally funded health centers and clinic, and/or through SCHC's employees, servants, agents, and/or contractors, and/or through those they supervised, issued

orders to, and/or directed, and/or through those they were supposed to supervise, issued orders to, and/or direct, failed to inform the Plaintiffs and/or their representatives of the reasonably foreseeable risks and benefits of, and alternatives to, the treatment proposed and rendered, which would have been disclosed by a reasonable medical practitioner in similar circumstances, in consequence of which defendants failed to obtain an informed consent thereto.

94.     A reasonably prudent person in the position of the Plaintiffs and/or their representatives would not have undergone the treatment and diagnosis rendered herein if he had been fully informed.

95.     The lack of informed consent alleged herein is a proximate cause of the injuries, conditions and disabilities for which recovery is sought.

96.     The Defendants are jointly and severally liable with the defendants in the State Court Action.

97.     This action falls within one or more of the exceptions set forth in CPLR §1602, and as such the Defendants are jointly and severally liable pursuant to the exceptions set forth in Article 16 of the CPLR.

98.     Pursuant to CPLR §1602 (2)(iv), the Defendants are jointly and severally liable for all of Plaintiffs' damages, including by not limited to, Plaintiffs' non-economic loss, irrespective of the provisions of CPLR §1601, by reason of the fact that the Defendants owed Plaintiffs a non-delegable duty of care.

99.     Pursuant to CPLR §1602 (2)(iv), the Defendants are jointly and severally liable for all of Plaintiffs' damages, including but not limited to, Plaintiffs' non-economic loss, irrespective of the provisions of CPLR §1601, by reason of the fact that the Defendants are vicariously liable for the negligent acts and omissions of their servants, agents, affiliated physicians and/or employees.

100.    Pursuant to CPLR §1602(7), the Defendants are jointly and severally liable for all of Plaintiffs' damages, including but not limited to, Plaintiffs' non-economic loss, irrespective of the provisions of CPLR §1601, by reason of the fact that the Defendants acted with reckless disregard for the safety of others, namely the Plaintiffs herein.

101.    By reason of the foregoing, and as a proximate cause of the foregoing, plaintiff G.B. suffered serious personal injuries, conscious pain and suffering, great pain, agony, mental anguish, emotional distress, hospitalizations, physical impairment, disability, brain damage, developmental delays, lost wages, medical expenses, pecuniary damages, and other injuries and damages, including hypoxia, ischemia, anoxia, asphyxia, acidemia, hypoxemia, cord wrapped around neck, hypoxic ischemic encephalopathy, lack of oxygen to the brain, lack of and decreased tone, need for resuscitation, need for supplemental oxygen, bruising, bruising of left and right arms, birth trauma, head trauma, physical disabilities, breathing problems, hypotension, cerebral palsy, brain damage, cognitive delays, developmental delays, decreases in cognitive ability, expressive language delays, developmental language disorders, verbal apraxia, speech articulation issues, speech/language impairments, need for educational therapy, need for speech/language therapy, unintelligibility of language and speech, learning disabilities, educational difficulties, need for special education, neurodevelopmental abnormalities, delayed and decreased ability to get thoughts onto paper, delayed and decreased math ability, delayed and decreased reading ability, delayed and decreased written and oral expression, long processing time, motor delays, developmental dyspraxia, developmental coordination disorder, hemiplegia, right spastic hemiplegia, asymmetry in upper extremity function, tightness of ankle, RLE and LLE dysfunction, limitations, and/or disabilities, fine motor skills delays and disabilities, decreased gross motor skills, need for occupational therapy, need for physical therapy, delays and decreased motor

functioning, difficulty with toilet training and wiping, encopresis, constipation, abnormal GI motility, GI dysfunction, need for pain medication, decreased motor function, decreased strength, flexibility, mobility, and endurance, decreased ability in activities of daily living, emotional distress, frustration, embarrassment, anxiety, mental anguish, decreased ability to work, future lost wages, loss of future fringe benefits, loss of future earning capacity, loss of enjoyment of life, medical expenses, need for extensive medical care, economic damages, and numerous other injuries and damages.

102.    By reason of the above, Plaintiffs bring this action for plaintiff G.B.'s conscious pain and suffering and injuries, emotional distress, and for damages, both general and special, in the sum of $45,000,000.00.

103.    The defendants including defendant United States, SCHC, and/or Dr. Scott are liable pursuant to 28 U.S.C. § 1346(b)(1).

## JURY DEMAND

Plaintiffs demand a trial by jury as to all issues that are so triable.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs G.B., an infant under the age of fourteen (14) years, by her Mother

and Natural Guardian, THOMAS BABILON, as Father and Natural Guardian of G.B. A/K/A BABY

S.S., an infant under the age of fourteen (14) years, demand judgment against defendant UNITED

STATES OF AMERICA, for damages on each cause of action totaling $45,000,000.00, plus

interest and costs and attorneys' fees incurred in this civil litigation, together with such other and further

relief at law or in equity that this Court deems just and proper.

Dated:  New York, New York
        November 30, 2017

                        Respectfully submitted,
                        THE JACOB D. FUCHSBERG LAW FIRM, LLP

                        By: _____
                        Christopher M. Nyberg, Esq. (520026)
                        Attorneys for Plaintiff
                        500 Fifth Avenue, 45th Floor
                        New York, New York 10110
                        (212) 869-3500
                        c.nyberg@fuchsberg.com